UNITED STATES of America, Appellee,

v.

Tyrone Rogers YOUNG, Appellant.

No. 79–6118.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 6, 1981.

Decided March 27, 1981.

William T. Clarke, Greenville, S. C., for appellant.

Kevin J. Harrington, Third Year Law Student (Justin W. Williams, U. S. Atty., Karen P. Tandy, Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, BUTZNER and WIDENER, Circuit Judges.

BUTZNER, Circuit Judge:

Tyrone Rogers Young appeals the district court's denial of his motion for relief under 28 U.S.C. § 2255 to vacate his conviction for robbery, use of a firearm, and kidnapping. Because Young's claim that he was denied a fair trial by reason of an attorney's alleged conflict of interest cannot be conclusively decided on the files and records of the case, we remand for an evidentiary hearing as prescribed by § 2255.[1]

**I**

After Young and his co-defendant, Wayne Hudson, were indicted, Young retained Thomas R. Dyson to represent him. Hudson retained John Shorter, a District of Columbia attorney, who asked Dyson, as an accommodation, to be associated as local counsel to satisfy a rule of the district court. Dyson appeared for both Young and Hudson at a pretrial suppression hearing. Young later terminated his employment of Dyson and retained JeRoyd X. Greene.

A week before the trial, Dyson, as Hudson's local counsel, moved for a continuance because Shorter's participation in a Washington trial would preclude his appearance on the day set for the Young-Hudson trial. Hudson, who was present, expressed a preference for Shorter, whom he had retained. The minutes of this motion do not appear in the record, but the government agrees that the court (Lewis, J.) denied the motion on the ground that Dyson could represent Hudson.

At the beginning of the trial (Bryan, J., presiding), Greene appeared as counsel for Young; Dyson appeared in Shorter's ab-

---

1. On direct appeal we affirmed. *See United States v. Young*, 512 F.2d 321 (4th Cir. 1975). The issue raised in this motion was not presented at that time. If it had been, we would have been required to remit Young to his remedy, if any, under § 2255 because the record of the criminal trial is insufficient to resolve this issue.

sence for Hudson. Greene moved for a severance on the ground that Young impermissibly would be subject to cross-examination by his former attorney, Dyson. The transcript discloses the following colloquy:

MR. GREENE: ... The problem that we have is that since this trial is a joint trial of both Defendants, my client will more than likely take the stand. If he takes the stand and if there is an attempt to show responsibility, assuming that that problem comes up, to the co-Defendant, then Mr. Dyson, representing the co-Defendant, would have a responsibility to cross examine him.

However, since he was once retained by Mr. Young, then there is a problem of him being able to cross examine a former client and, of course, my client would not waive the lawyer-client privilege which he entered into with Mr. Dyson when he originally represented him.

THE COURT: You really anticipate this becoming a real problem, other than a theoretical one?

MR. GREENE: Yes, sir, I do. I present that to the Court.

[THE PROSECUTOR]: Your Honor, I would point out to the Court that the change in counsel has not changed the situation at all in that Mr. Dyson was always local counsel for Mr. Hudson.

THE COURT: What is your motion?

MR. GREENE: My motion would be for a severance at this time.

THE COURT: That motion will be denied.

At the conclusion of the government's case, Greene moved for a mistrial:

MR. GREENE: ... The other motion we have again is a motion for mistrial at this time for the prejudicial joinder of this case in terms of both defendants because—

THE COURT: Motion will be denied on that.

After a suppression hearing conducted out of the presence of the jury, Greene again adverted to Dyson's former representation of Young:

MR. GREENE: Before the jury comes in, your Honor, I will indicate that I am instructing my client of the prejudicial effects that may be attendant to him assuming the Court doesn't sever them in terms of his taking the stand and that his decision to ask for this jury trial—

THE COURT: Wait a minute. . . .

MR. GREENE: His decision to ask for this jury trial contemplates his desire to and right to testify in his own behalf and that his testimony and his decision to testify is based upon his constitutional right which we feel this Court has at least limited or fettered by the presence of his previously retained counsel, who has every right to cross-examine him on any fact which he brings up, because of the fact that we have co-defendants on trial.

And if your Honor, the Court, insists on maintaining Mr. Dyson as counsel of record for Mr. Young—I mean Mr. Hudson, or the Court refuses again my motion to sever, then I will instruct my client that he can take the witness stand but with the full understanding that he not waive his attorney-client privilege with Mr. Dyson and with the understanding that Mr. Dyson would have every reason not to follow that attorney-client privilege based upon the fact that he has now a higher interest since he has not, since his being retained has been severed, in terms of Mr. Hudson's position, and I believe that the evidence would establish that there will be a conflict in terms of their positions in this matter and the case is now ripe for decision on the question of whether the Court allows Mr. Young to take the stand or not, put it that way, would advise Mr. Young that if he fails to take the stand that he waives it in lieu of the fact that the Court will not limit Mr. Dyson from cross-examining him and will not instruct Mr. Dyson not to cross-examine him.

THE COURT: This is the same situation now as it was when these two defendants first employed their counsel, isn't it?

MR. GREENE: Yes, sir, but the Court has—

THE COURT: I don't think they are in any position to either force a co-counsel out of the case by changing counsel in mid-stream or limit his cross-examination, so if he elects not to take the stand on that ground then that is entirely up to him.

MR. GREENE: He has no control, your Honor, over being—My position is—

THE COURT: He had control over who he wanted as counsel.

MR. GREENE: Well, when he had no control over his employment, Mr. Dyson's employment by Mr. Hudson. As a matter of fact, he only—

THE COURT: They both went to some other counsel first, didn't they?

MR. GREENE: No, sir. Mr. Young hired Mr. Dyson first. Mr. Hudson hired Mr. John Shorter of Washington and as a convenience to Mr. Shorter Mr. Dyson undertook to be local counsel.

Now the problem, of course, is—

THE COURT: Had the situation stayed all the way through we would be exactly where we are today.

Dyson then recounted his efforts to get a continuance because Shorter would be unavailable, and the following colloquy occurred:

THE COURT: But [the motion for a continuance was] not on any conflict of interest basis?

MR. DYSON: No.

THE COURT: I am not limiting anybody's right of cross-examination or any such thing as that. This comes up today for the first time, doesn't it?

MR. DYSON: That is true, your Honor.

THE COURT: All right.

MR. DYSON: And Mr. Hudson is on the record as saying he wanted Mr. Shorter and he didn't want me, and in the face of that Judge Lewis appointed me to defend Mr. Hudson.

THE COURT: All right.

MR. DYSON: Whether or not there is a conflict I don't think anybody in the world can tell until it happens.

THE COURT: Well, I am not going to have the Court put in the position of having you say you are not going to put him on the stand because of some possible conflict.

If you are in that position or if your client is, Mr. Greene, he put himself in that position, and I am not going to—If he wants to take the stand, fine; if he doesn't, fine. He has a perfect right not to. If he doesn't I will tell the jury he has a perfect right not to.

But if he finds himself with an attorney on the other side that might ask him some questions that he doesn't want to answer because of any privilege that he is able to assert, or otherwise, that is of his own doing, in my view.

At the conclusion of the defendants' case, Greene advised the court that Young would have testified had Dyson not been present. Young then rested without testifying.

## II

■ The government urges affirmance of the dismissal of the § 2255 motion because Young did not comply with the district court's order that he submit "an affidavit indicating specific information that was in the possession of Dyson at trial that could have been introduced on cross-examination and incriminated petitioner had he chosen to take the stand." Young, at that time acting pro se, responded with a memorandum in which he claimed that this information was protected by his attorney-client privilege.

We find no ground for affirmance in this incident. In *Holloway v. Arkansas*, 435 U.S. 475, 485–87, 98 S.Ct. 1173, 1179–80, 55 L.Ed.2d 426 (1978), the Court cautioned that when defense counsel suggests a conflict of interest, he should not be pressed to divulge confidential information received from his client. We believe that this admonition is applicable when a defendant presents the same issue. To require him to reveal what he told his lawyer would destroy the attorney-client privilege that conflict of interest rules are designed to protect.

## III

██ Although successive representation of co-defendants differs chronologically from multiple representation of co-defendants by the same lawyer, the possibility of a conflict of interest is not dispelled by the termination of the former lawyer's services. The lawyer may have received confidential information from his former client that is detrimental to that client but favorable to the lawyer's present client. In this event, a conflict of interest arises that is not substantially different from that which may occur in instances of multiple representation. Therefore, the Supreme Court's most recent opinion on the subject of conflict of interest in a multiple representation case is instructive. In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Court, after reviewing its earlier opinions dealing with this issue, explained and clarified the principles that govern its resolution.[2] Applying these principles to the situation of successive representation, we have reached the following conclusions.

██ Successive representation is permissible unless it gives rise to a conflict of interest. 446 U.S. at 348, 100 S.Ct. at 1718. When a defendant raises an objection about successive representation, the trial court should afford him an opportunity to show that the potential conflict infringes his right to a fair trial. 446 U.S. at 348, 100 S.Ct. at 1718.[3] Although the mere possibility of a conflict of interest is insufficient to set aside a conviction, when the defendant shows that an actual conflict of interest resulting from the successive representation affected his right to a fair trial, he need not demonstrate prejudice. 446 U.S. at 349–50, 100 S.Ct. at 1718–19.

██ In the case of multiple representation, the Court explained that a conflict of interest infringes a defendant's sixth amendment right to effective counsel. 446 U.S. 348–50, 100 S.Ct. at 1718–19. A conflict of interest arising out of successive representation would not necessarily infringe a defendant's sixth amendment rights with respect to his present counsel. Nevertheless, it could impermissibly impair a defendant's right to testify free of cross-examination by his former attorney to whom he had confided information that is detrimental to him but beneficial to the lawyer's present client. In this event, the defendant's right to a fair trial, which the due process clause secures, would be compromised.

## IV

Young brought the potential conflict of interest to the attention of the district court by a motion for a severance. Without conducting an evidentiary hearing to explore the alleged conflict of interest, the court denied the motion and ruled that it would not limit Young's cross-examination by his former attorney. In making these rulings, it adverted to the fact that all defense counsel in the case were privately retained.

This fact, however, did not provide a legally sufficient basis for omitting an evidentiary hearing. In *Cuyler* the Court put to rest distinctions between appointed and retained counsel with respect to conflicts of interest. The Court referred to its earlier decisions establishing that "court procedures that restrict a lawyer's tactical decision to put the defendant on the stand unconstitutionally abridge the right to counsel." 446 U.S. at 344, 100 S.Ct. at 1716. It then held: "Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, we see no basis for drawing a distinction between retained and appointed counsel that would deny

---

**2.** *Cuyler* and *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), on which *Cuyler* relied in part, were decided after Young's trial, and consequently the district court did not have the benefit of these opinions.

**3.** In *Cuyler* the Court held that state judges are not required by the Constitution to initiate inquiries about the effect of multiple representation. The duty of a federal court to make such inquiries is governed by Fed.R.Crim.P. 44(c) which became effective Dec. 1, 1980. *See Cuyler*, 446 U.S. at 346 and n.10, 100 S.Ct. at 1717 and n.10.

equal justice to defendants who must choose their own lawyers." 446 U.S. at 344–45, 100 S.Ct. at 1716–17.

The government urges that Young's former attorney, Dyson, disclosed to the court an adequate factual basis for finding that no conflict of interest existed.

We cannot accept this argument. The transcript, which we quoted in Part I, discloses that Dyson, acting on behalf of Hudson, not Young, moved for a continuance on the sole ground that Hudson's principal lawyer could not be present. He did not then mention any conflict of interest. Later, however, when the court was considering Young's motion for a severance, Dyson stated: "Whether or not there is a conflict, I don't think anybody in the world can tell until it happens." This statement does not support the government's contention. It does not establish a factual basis for holding that no conflict of interest existed. On the contrary, it demonstrates that Dyson was aware that an actual conflict might arise.

For his part, Young argues that because he made timely objection at trial and the court denied his motion for a severance without a hearing, we should presume there was an actual conflict of interest. Young relies on *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), another multiple representation case. There the Court held that if an attorney representing co-defendants alerts the court to a probable conflict of interest, the defendants are deprived of effective assistance of counsel if the judge fails either to appoint separate counsel or to take adequate steps to ascertain whether the risk is too remote to warrant such separate appointment. 435 U.S. at 484, 98 S.Ct. at 1178. *See also Cuyler*, 446 U.S. at 348, 100 S.Ct. 1717.

Because of the difference between multiple and successive representation, we decline to presume that Young was denied a fair trial. When defense counsel alerts the court to a possibility of conflict in a multiple representation case, he obviously claims first-hand knowledge of the conflict and of his inability to afford effective representation. The record in this case, however, illustrates why the presumption applied in cases of multiple representation is not necessarily appropriate for instances of successive representation. Young's former counsel was aware that a conflict might arise, but because he could not foretell Young's testimony, he was unable to say with any certainty whether there would be a conflict. Young's second counsel suspected that a conflict would arise, but, lacking the information that counsel in multiple representation cases have, he was unable to represent on the basis of his own knowledge why there would be a conflict. At the most, he was able to suggest only that Young would be subject to cross-examination by his former counsel. This examination, depending on its content, might, or might not, disclose a conflict of interest. In the absence of a fuller explanation, his anticipation of the conflict was speculative. We therefore conclude that the factual predicate for the presumption that the court applied in *Holloway* is lacking. The statements of both counsel, however, were sufficient to warrant further exploration of the potential conflict. *See Cuyler*, 446 U.S. at 346, 100 S.Ct. at 1717.

## V

Section 2255 of Title 28 U.S.C. provides that unless the record conclusively shows that the prisoner is entitled to no relief, the district court should conduct an evidentiary hearing and state its findings and conclusions. The critical question in this case is whether an actual conflict of interest adversely affected the fairness of Young's trial. The record does not disclose the necessary facts to answer this question.

Accordingly, we remand the case for an evidentiary hearing. Young should be required to state what his testimony would have been had he taken the stand at the criminal trial. With this information at hand, Dyson should be questioned to determine whether, in his role as Young's former attorney, he received from Young information detrimental to Young's defense that he

could have used on cross-examination to buttress Hudson's defense. An inquiry of this nature accords great weight to a lawyer's perception of a conflict, but as *Cuyler* reiterates, "courts necessarily rely in large measure upon the good faith and good judgment of defense counsel" in determining whether an actual conflict of interest exists. 446 U.S. at 347, 100 S.Ct. at 1717. With the benefit of hindsight furnished by *Holloway* and *Cuyler*, it is apparent that the district court should have pursued essentially this inquiry when Greene moved for a severance. The court then could have determined whether a conflict actually existed or whether the motion was a dilatory tactic. *Holloway*, 435 U.S. at 486–87, 98 S.Ct. at 1179–1180.

For the reasons we mentioned in Part II, neither Young nor Dyson should be required to divulge the content of the privileged information that Dyson received, unless Young expressly waives the lawyer-client privilege.

If the court finds that Dyson had received from Young information detrimental to his defense and beneficial to Hudson's it will be apparent that a conflict of interest existed. It also will be apparent that this conflict impermissibly infringed Young's right to testify in his own behalf, for, in accordance with the ruling of the court, he was either required to answer incriminating questions or seek refuge in the lawyer-client privilege. In either event, his right to a fair trial would have been infringed, and he should be granted a new trial.

Conversely, if the facts disclose that no conflict of interest existed, the judgment need not be disturbed.

*VACATED AND REMANDED.*